[Civ. No. 22511.   Second Dist., Div. Three.   Apr. 29, 1958.]

GEORGE GARDNER, as Trustee in Bankruptcy, etc., Appellant, v. H. P. SIMPKINS et al., Respondents.

Murray M. Chotiner and Gray & Guy for Appellant.

Egly & Wiener, Nichols, Cooper, Hickson & Lamb for Respondents.

PATROSSO, J. pro tem.[*]—This action was instituted by Vivian A. Corradini to rescind a contract whereby he purchased from the defendant Simpkins a half interest in what is referred to in the record as a sewer business owned by the latter upon the alleged ground that he had been induced to enter into the contract for the purchase thereof by reason of certain false and fraudulent representations of Simpkins. Subsequent to the rendition of judgment in favor of the defendants, plaintiff was adjudicated a bankrupt and his trustee in bankruptcy was substituted in his stead as plaintiff herein and prosecutes this appeal. In this opinion we shall continue to refer to the original plaintiff as such and to the defendant Simpkins by name.

Viewed in the light most favorable to the defendants the material facts necessary to an understanding of the questions

---

[*]Assigned by Chairman of Judicial Council.

involved are these: On November 7, 1954, plaintiff caused to be published an advertisement in the Los Angeles Times reading as follows:

"BUSINESS WANTED: Are you in the 70% or higher inc. tax bracket? Why not sell to me an interest in your business for a capital gain. Gain an active partner + only a small loss to you after taxes. Check this proposition with your tax attorney for its soundness. Can stand rigid investigation; best refs. I will invest up to $200,000 cash. Give brief outline of your business 1st letter. Box G-186, Times."

In response to this Simpkins on November 8, 1954, addressed a letter to the address given in the advertisement wherein he stated that he had a "sewer contracting buisness [sic] which is netting over $6000.00 per month"; that he had more business than he could take care of; and that his reason for selling part of his business was "that I need help in the management as it looks like it will double within the next year." At this time Simpkins was a contractor engaged in installing cesspools and septic tanks and the rental of movable toilets in what may be termed the San Gabriel Valley although he also operated farther to the east and to some extent in Orange County. He had been so engaged since 1948, starting in a modest manner and gradually expanding his business until 1953, when it earned a net profit after depreciation of $52,297.89.

As a result of this correspondence plaintiff arranged for a meeting with Mr. Simpkins on November 11th. Plaintiff was then approximately 49 years of age. From 1930 until 1946 he had been engaged in the business of lace manufacturing in the State of New Jersey; first starting in his father's business which then consisted of six or seven employees. In 1935 he acquired a half interest in the business from his father by way of gift and in 1943 he acquired the other half by purchase. He thereafter continued to operate the business as sole proprietor until he sold the same in 1946, at which time the business had approximately 40 employees and was doing an annual business of between $250,000 and $275,000 and during which period the business was under plaintiff's management. Subsequent to 1946 plaintiff had engaged in the business of importing embroidering machines from Europe and in loaning money upon the security of real property. He was familiar with books of account, profit and loss statements, depreciation and the capital gains tax.

At the first meeting between the parties Simpkins exhibited to plaintiff an adding machine tape showing the profits of

his business for the calendar years 1948 to 1953 inclusive as well as for the first three months of 1954. The figure for the latter period was $18,106.84. Simpkins stated to the plaintiff that the figures shown thereon for the calendar years 1948 to 1953 inclusive were net after depreciation but that the figure for the first three months of 1954 was before depreciation. At the same time Simpkins exhibited to plaintiff profit and loss statements for the period ending March 31, 1954, and the period ending June 30, 1954, the figure for the latter period being $41,845.70. These profit and loss statements upon their face disclosed that no deduction had been made for depreciation and Simpkins so advised plaintiff.

Two subsequent meetings were held between the parties before any agreement was consummated. During the course of these Simpkins explained to the plaintiff that his business was getting bigger all of the time and that there was no reason why, with some help, it could not continue to do so; that he, Simpkins, was going into the business of installing sewers and that he intended to go to Port Hueneme where a sale was to take place and purchase equipment which would enable him to engage in this type of business; that he intended to purchase such equipment whether or not plaintiff should acquire an interest in the business; that an ordinance had been adopted and that sewers were coming into Covina and West Covina, in which area Simpkins was operating, and that as a consequence there would be additional income from the sewer contracting business; that with sewers coming in he thought the business would double because he would keep the cesspool business which would move farther out into new subdivision areas where there were no sewer systems. Simpkins stated that his asking price for the business was $125,000 but that he would sell one-half of it for $62,500 plus one-half of the actual cost of any equipment purchased by him at the Port Hueneme sale.

During the course of these several meetings the equipment owned by Simpkins and used in the business was discussed and explained to plaintiff and shown to him. Also Simpkins took plaintiff around to various places where he had work in progress and showed him the work being done there and the manner in which it was being performed.

On November 12 plaintiff requested his banker to check upon the financial responsibility of Simpkins, and from this source was advised that the manager of the bank with whom

Simpkins transacted business had informed plaintiff's banker that Simpkins had been very successful in his business operations; that his net worth had substantially increased since he commenced business and that the bank's dealings with him had been very satisfactory.

On December 11 or 12 plaintiff requested Martin A. Samuelson, a certified public accountant of considerable experience, to make an investigation of Simpkins' financial records for the years 1952 and 1953. At this time plaintiff delivered to Mr. Samuelson the financial statements furnished to him by Mr. Simpkins as previously stated and on December 14, in compliance with plaintiff's request, Samuelson went to Simpkins' place of business and spent some two hours there in going over the books and records of Simpkins and talking to Mr. and Mrs. Simpkins. While there, there was made available to Mr. Samuelson the journal and general ledger, which he examined, as well as copies of Simpkins' federal income tax returns which he checked against the financial statements that had been furnished plaintiff. Samuelson also examined the profit and loss statement for the period ending November 30, 1954, which showed a profit before depreciation of $67,900. When he left Simpkins' place of business, Mr. Samuelson took with him copies of the federal income tax returns and the financial statements previously mentioned which he retained for a period of some two weeks. Following his investigation of Simpkins' records Samuelson advised plaintiff that he found that the income tax returns checked with the figures on the profit and loss statements which Simpkins had furnished to the plaintiff.

On December 17 plaintiff took Simpkins to the office of his attorney James Boyle, at which time plaintiff stated, as he had previously stated to Simpkins, that Mr. Boyle would be representing him, plaintiff, in the transaction as his attorney. At this time plaintiff stated to Mr. Boyle the terms of the agreement that he desired him to prepare which was generally to the effect that plaintiff would purchase one-half of Simpkins' business for $65,950, payable $40,950 in cash and the balance to be evidenced by promissory note of $25,000 bearing interest at six per cent; the immediate formation of a corporation and the transfer to it of plaintiff and Simpkins' interest in the business in exchange for stock. Agreements to this effect were prepared by Mr. Boyle at plaintiff's direction and executed by the parties.

Subsequently on January 4, 1955, plaintiff's accountant,

Mr. Samuelson, addressed a letter to Mr. Boyle suggesting changes in the agreement as prepared and executed by the parties on December 17. A new agreement in accordance with Mr. Samuelson's recommendations was prepared by Mr. Boyle and executed by the parties on the same date. By the terms of the modified agreement it was provided that plaintiff should pay Simpkins $65,950, payable $20,950 in cash and a promissory note for $45,000, each party to purchase stock in the new corporation in the amount of $20,000; the corporation to purchase from plaintiff and Simpkins for the total sum of $131,900 all of the fixed assets of the business owned by them, payable $65,950 to each as follows: $20,000 cash and the new corporation's promissory note in the sum of $45,950. It was further provided that upon receipt of the $20,000 cash payment from the corporation plaintiff would immediately pay said sum to Simpkins to apply on plaintiff's promissory note to the latter in the sum of $45,000, as security for the payment of the balance of which the plaintiff agreed to pledge the corporation's note payable to plaintiff.

Parenthetically it should be noted that prior to the time that the parties reached an agreement, Simpkins, as he had previously stated to plaintiff he intended to do, had purchased additional equipment at the sale at Port Hueneme for the sum of $20,000 in cash.

The parties' association did not prove to be a happy one. Within two weeks of the time that the new venture began operations plaintiff expressed some dissatisfaction therewith and Simpkins then stated to him that if he was unhappy he was willing to cancel the transaction provided plaintiff would pay the expenses incurred with Mr. Boyle. Plaintiff then apparently had a change of heart and stated that he wanted to continue. However, the differences between the parties increased, each blaming the other for the unsatisfactory results of the business, and on May 16, 1955, plaintiff caused notice of rescission to be served upon Simpkins.

The trial court found that it was not true as alleged by plaintiff that Simpkins had made any false or fraudulent representations to induce plaintiff to enter into the transaction and further found that it was not true that plaintiff relied upon any representation or statements made to him by Simpkins but on the contrary that he entered into the transaction with full knowledge of the true facts.

The trial court's findings are assailed by plaintiff as being unsupported by the evidence. His principal argument

in support of his claim is that the statement contained in Simpkins' letter in reply to plaintiff's advertisement to the effect that his business was "netting over $6000.00 per month" was patently false because it necessarily implied that this was after deducting depreciation. However, as appears from the foregoing recital of the evidence this fact was made known to the plaintiff at the very first interview with Mr. Simpkins, and was disclosed upon the face of the profit and loss statements for the periods ending March 31, 1954, June 30, 1954, and November 30, 1954, which were made available to plaintiff and his accountant and with which plaintiff was fully advised prior to entering into the transaction in question. There is no claim that these profit and loss statements were incorrect or that they did not truly reflect the condition of Simpkins' business for each of the periods indicated. Each of these statements disclosed that the profit for each of these periods before any deduction for depreciation was in excess of $6,000 per month. In the light of this we see no basis for the claim that plaintiff was deceived by the statement in the letter that Simpkins' business was netting over $6,000 per month.

Plaintiff also contends that Simpkins was guilty of fraud in that he knew that sewer systems were being installed in various cities in the area in which Simpkins was operating and that such installation would operate to eliminate the necessity for cesspools in such areas, and hence that Simpkins was not warranted in expressing the opinion which he did that the business would continue to materially increase or even double within the next year. As previously noted at the first meeting between the parties Simpkins told plaintiff of the fact that an ordinance had been adopted for the sewering of the cities of Covina and West Covina and that, while this would cause the cesspool business to move farther out into new areas where no sewers were installed, the need for cesspools in such new areas would continue and that in addition the coming in of sewers would provide a new source of revenue. Moreover, that Simpkins' opinion as to the increase in the cesspool business that might be anticipated within the next year was not without foundation is indicated by the testimony of others engaged in the cesspool business in the same general area, despite the installation of sewers, their business had substantially increased during the year 1955 and in one case as much as 471 per cent. In view of this testimony the fact that the business operated at a loss during January and February does not compel the conclusion that when Simpkins expressed the

opinion that the business should greatly increase during the next year that he had no reason to believe that this would be true. Admittedly the operations during this period were interrupted by inclement weather which undoubtedly influenced the volume of work performed. However, in March the business earned a profit before depreciation of $7,807.64 and this despite the fact that in accordance with the agreement plaintiff and Simpkins each drew a salary during this period of $1,000 per month. While the business decreased in April and May the trial court could reasonably conclude that this was in large measure due to the disagreement between the parties which culminated in the service of plaintiff's notice of rescission on May 16.

Aside from other considerations the judgment is supported by the trial court's finding that plaintiff did not rely upon any representation made to him by Simpkins and this finding is amply sustained by the evidence. As noted in the recital of the evidence in an earlier portion of this opinion, plaintiff, prior to entering into the contract with Simpkins, made a full investigation with respect to the operation and past earnings of the business. In this he had the assistance of an experienced public accountant who checked the profit and loss statements furnished by Simpkins against the federal income tax returns for previous years and found them to be in substantial accord therewith. While the accountant testified that he did not make a detailed audit of the books, as previously stated, there is no claim that the profit and loss statements were not true and correct. The record discloses that Simpkins' books were present in court during the trial and no attempt was made to show any discrepancies between them and the profit and loss statements. As stated in *Carpenter* v. *Hamilton* (1936), 18 Cal.App.2d 69, 71 [62 P.2d 1397]: "Plaintiffs had a right to rely upon the representations made to them concerning matters of fact which were unknown to them, without making any inquiry concerning the truth thereof, and had they done so defendant could not evade the consequences of any false and fraudulent statements he may have made by showing that means of knowledge of the truth were easily available to plaintiffs. (Citations.) But the right to rely upon the representations, of course, does not exist where a purchaser chooses to inspect the property before purchase, and, in making such inspection, learns the true facts, for the obvious reason that he has not been defrauded unless he has been misled, and he has not been misled where he has acted

with actual or imputed knowledge of the true facts. (Citations.)''

Finally plaintiff contends that the trial court erred in denying his motion for a continuance made on the morning that the case was called for trial. The ground stated for the motion was that Mr. Boyle, whose firm was counsel of record for the plaintiff, had some days previously been served with a notice to produce certain documents ''which would disclose that he would of necessity be one of the principal witnesses in the law suit,'' and that the attorney making the motion, who was a partner in Mr. Boyle's firm, was of the belief that the canons of judicial ethics would prevent his trying the action with Mr. Boyle as a witness. In connection with his motion for a continuance he moved to substitute Mr. Leonard Shelton as attorney of record for the plaintiff stating that the latter had no knowledge of the case except such as had been given him that morning. Defendants objected to a continuance upon various grounds. It was pointed out that on January 26, 1956, the case was set for trial on June 18, 1956, the date it was called for trial and that defendants were under a restraining order preventing the disposition of any of the defendants' assets. Furthermore, defendants expressly stated that they would raise no objection to Mr. Boyle being a witness in the case. The trial judge advised counsel that, in view of the condition of the calendar in the Pomona department where the case was pending for trial, if a continuance were had the case would have to go over for approximately one year and that under the circumstances the motion would have to be denied. The case, however, was continued for trial until the following morning at which time the trial commenced with the plaintiff's case being actively conducted by Mr. Shelton. However, the record discloses that a member of Mr. Boyle's firm was present throughout the trial and actively participated therein. Mr. Boyle was not called as a witness by either party and, while the exact nature of the documents which it was demanded he produce is not made to appear, they were presumably the agreements prepared by Mr. Boyle, executed by the parties, which were introduced in evidence and concerning the admissibility of which no objection was or is raised.

While plaintiff advances the claim that Mr. Shelton was not adequately prepared to try the case and hence that the trial court abused its discretion in denying the motion for a continuance, a reading of the record completely belies such claim. The record discloses that plaintiff's case was presented by Mr. Shelton with consummate skill and as it could have been

presented only by one having a complete and detailed knowledge of every aspect of the action. Moreover, after the case had been on trial for three days it was continued for a week. If, as does not appear, any further time for preparation was required by Mr. Shelton it was afforded him during this interval. The court did not abuse its discretion in denying the continuance and plaintiff suffered no prejudice as a result thereof.

The judgment is affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied May 14, 1958, and appellant's petition for a hearing by the Supreme Court was denied June 25, 1958.